**FIRST DIVISION**
**DOYLE, C. J.,**
**ANDREWS, P. J., and RAY, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 2, 2016**

# In the Court of Appeals of Georgia

A16A1435. THE STATE v. YOUNG.                                    DO-052

DOYLE, Chief Judge.

Alfreda Jayblee Young was arrested and charged with driving under the influence of alcohol to the extent it was less safe ("DUI less safe"),[1] driving under the influence of alcohol with an unlawful blood alcohol concentration ("DUI per se"),[2] and impeding traffic.[3] Following a hearing, the trial court granted Young's motion in limine to exclude the results of the State-administered chemical testing of her breath, finding that the State failed to establish that she voluntarily consented to the test. The State appeals, and we reverse for the reasons that follow.

---

[1] OCGA § 40-6-391 (a) (1).

[2] OCGA § 40-6-391 (a) (5).

[3] OCGA § 40-6-184 (a).

When reviewing a trial court's grant or denial of a motion to exclude evidence of chemical testing, "the trial court's findings on disputed facts will be upheld unless clearly erroneous, and its application of the law to undisputed facts is subject to de novo review."[4] Based upon the reading of the implied consent notice and the

---

[4] (Punctuation omitted.) *Barrett v. State*, 289 Ga. 197, 200 (1) (709 SE2d 816) (2011), quoting *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005).

videotaped recording of Young's interaction with the police,[5] we conduct a de novo

review of the trial court's ruling.[6]

---

[5] The appellate record transmitted from the trial court contained a *photocopy* of the DVD of Young's arrest; the DVD was not included in the record. We note that Court of Appeals Rule 18 (b) provides: "When the notice of appeal directs that transcripts of a trial or a hearing be included in the record, copies of all video or audio recordings that were introduced into evidence shall be transmitted to this Court along with the trial or hearing transcript. It shall be the responsibility of the party tendering the recordings at a trial or a hearing to ensure that a copy of the recording is included in the trial court record; however, it is the burden of the appealing party to ensure that a complete record is transmitted to this Court on appeal, including the transmission of video or audio recordings. If a transcript of a trial or a hearing is designated as part of the appellate record, the clerk of the trial court shall then include the copy of the recording in the appellate record transmitted to this Court. If a copy of a recording played at a trial or a hearing is not included with the transcript designated to be transmitted in the appellate record, this Court may take whatever action is necessary in order to ensure completion of the record, including, but not limited to, issuing a show-cause order requiring an explanation of its absence. The appellant's failure to complete the record may also result in this Court declining to consider enumerations of error related to the missing evidence. Copies of any video or audio recordings of evidence shall be submitted to this Court on DVD or on video or audio compact disc, and shall include any proprietary software necessary to play the recordings."). Although this Court ultimately obtained a copy of the DVD from the trial court, we reiterate that the burden remains on the appellant – in this case, the State – to perfect the record on appeal.

[6] See *Vergara v. State*, 283 Ga. 175, 178 (1) (657 SE2d 863) (2008) ("where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo") (punctuation omitted); *State v. Depol*, 336 Ga. App. 191 (784 SE2d 51) (2016) ("to the extent that the controlling facts are undisputed because they are plainly discernable from the patrol-car-mounted video recording, . . . we review those facts de novo") (punctuation omitted).

Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact [not recorded on a videotape], we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts. This includes legal determinations based upon the totality of the circumstances.[7]

So viewed, the record shows that at approximately 2:00 a.m. on December 28, 2014, Gwinnett County Police Department Patrol Officer Jason Bentley was traveling south on Interstate 85 near Beaver Ruin Road when he observed "a lot of commotion," including vehicles activating their brake lights and swerving. As he neared the scene, Bentley observed a Hyundai Tiburon stopped in one of the middle lanes of the five-lane highway, impeding the flow of traffic and almost causing multiple accidents. Bentley activated his blue lights, approached the vehicle, and made contact with the driver, identified as Young, who was talking on her cell phone.

Bentley smelled alcohol as soon as Young lowered her window, and she appeared visibly upset. Young stated that her vehicle had hydroplaned and that "she pulled off the road . . . because she didn't feel safe driving."[8] Bentley obtained

---

[7] *Hughes v. State*, 296 Ga. 744, 750 (2) (770 SE2d 636) (2015).

[8] Young had not pulled off the road and was instead still positioned in one of the middle lanes of the highway.

4

Young's license and was almost struck by another vehicle as he attempted to walk back to his car, at which point he instructed Young to move her vehicle to the left shoulder between the median wall and the HOV lane.

DUI Task Force Officer Richard Ross then appeared on the scene, and he spoke to Young, who conceded that her vehicle had been parked in the middle of the interstate. Young's eyes were bloodshot and watery, her speech was slow, and Ross noticed an odor of alcohol emanating from her vehicle and her breath. When Ross asked Young if she had been drinking, she responded that she had "one or two beers . . . way earlier in the day."

Young agreed to submit to a field sobriety evaluation. She was "slow and unsteady" as she exited her vehicle. Because they were positioned on a major interstate in dark and rainy conditions, Ross instructed Young to sit in Bentley's patrol car so that Ross could safely perform a horizontal gaze nystagmus ("HGN") test. At this point, the camera on the patrol car began recording, and it includes the audio of the interaction between Young and the officer.[9] According to Ross, he

---

[9] The video depicts the back of Bentley's patrol car and the officers and Young while they are outside of the car; it does not show Young while she is inside the car. The audio is not entirely clear given the ambient noise, including passing cars, but the communication between the officers and Young during her arrest and the reading of the implied consent notice and her response are audible.

observed six out of six clues during the HGN test, indicating an alcohol concentration of .08 grams or more. Ross also asked Young to blow into a portable Alco-Sensor device, which she did, and her breath tested positive for alcohol. Ross testified that he decided against performing additional field sobriety tests, such as the walk-and-turn and one-legged stand, because of safety concerns.

Based on his investigation, Ross advised Young that she was under arrest for DUI. He then instructed her to exit the patrol car, handcuffed her hands behind her back, searched her, and placed her in the back of his patrol vehicle. Ross then read Georgia's implied consent notice for drivers over the age of 21 and asked Young whether she would submit to the State-administered breath test.[10] Young immediately

[10] The implied consent notice read to Young, which applies to suspects over 21, is found in OCGA § 40-5-67.1 (b) (2) and states: "Georgia law requires you to submit to [S]tate administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this [S]tate will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this [S]tate may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the [S]tate[-]administered chemical tests of your (designate which tests) under the implied consent law?"

replied, "Yes," without hesitation. Ross characterized his demeanor during this colloquy as "very respectful," and the video supports this characterization.

After retrieving her purse from her vehicle, Ross transported Young to the police precinct, sat her in front of the Intoxilyzer 9000, which was located in a cubicle, gave her verbal instructions, and then administered the test. According to Ross, Young "did not appear reluctant," was "comprehensive [sic]," seemed intelligent, listened to his instructions, and did not refuse to take the test. Ross "[did not] have any sort of concerns that [Young] was so impaired that she couldn't consciously make a decision." Young remained handcuffed during the testing, which indicated blood alcohol concentrations of .160 and .151.

Young filed a motion in limine to exclude the results of the State-administered breath test, arguing that she did not voluntarily consent to it and that it violated the United States and Georgia Constitutions. Following a hearing at which both Bentley and Ross testified, the trial court granted Young's motion solely based upon its conclusion that "the State failed to carry its burden in establishing an actual consent to the search of . . . Young's breath that was free and voluntary." In the order, the trial court stated:

Young was asked if she would submit to the testing under the implied consent law but was not asked if she would consent to a search and test of her bodily substances. Young's affirmative response was to the officer[,] and she was submitting to his authority to conduct the test. [Young] was told that the law requires her to submit to the test[,] and [she] asserts that any subsequent submission must be characterized as mere acquiescence to a claim of lawful authority, and Young was not advised that she could refuse to submit to the test.

In evaluating the totality of the circumstances, the [c]ourt finds that Young was under arrest and in handcuffs when the submission to the search was requested. [Young] was not informed that the test was not mandatory[,] and the language of the implied consent warning suggests otherwise as it begins "Georgia law requires that you submit. . . ." [Young] was not advised of her *Miranda*[11] rights[,] and she was not asked if she was freely and voluntarily agreeing to be tested.

The State appeals, arguing that the trial court erred by granting Young's motion in limine.

The Fourth Amendment of the United States Constitution and Article I, Section I, Paragraph XIII of the Georgia Constitution both protect an individual's right to be free of unreasonable searches and seizures, and apply with equal force to the compelled withdrawal of blood, breath, and other bodily substances. Because a breath test is a

---

[11] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

8

search within the meaning of the Fourth Amendment, absent a warrant, the State must show that it falls into one of the specifically established and well-delineated exceptions to the warrant requirement.

Consent is a valid basis for a warrantless search where it is given freely and voluntarily, and the State does not argue that any other exception might apply. Therefore, [in this case,] the only question in regard to the validity of the search is whether the State met its burden of proving that [Young] actually consented freely and voluntarily under the totality of the circumstances. Historically, we considered a defendant's affirmative response to the reading of the implied consent notice as sufficient to allow a search of . . . her bodily fluids without further inquiry into the validity of the defendant's consent.[12]

However, in *Williams* [*v. State*],[13] the Georgia Supreme Court rejected this rule automatically equating an affirmative response with actual consent to search, holding instead that mere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant. Thus, the State is required to demonstrate actual consent for [S]tate-administered testing for the purpose of exception to the warrant requirement. And in

---

[12] (Citations and punctuation omitted.) *Kendrick v. State*, 335 Ga. App. 766, 768-769 (782 SE2d 842) (2016), quoting *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015).

[13] 296 Ga. at 817.

determining whether the defendant gave actual consent to a [S]tate-administered breath test, the trial court is required to address the voluntariness of the consent under the totality of the circumstances.[14]

[V]oluntariness must reflect an exercise of free will, not merely a submission to or acquiescence in the express or implied assertion of authority. Consequently, the voluntariness of consent to search is measured by evaluating the totality of the circumstances, which includes factors such as prolonged questioning; the use of physical punishment; the accused's age, level of education, intelligence, length of detention, and advisement of constitutional rights; and the psychological impact of these factors on the accused. And while knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.[15]

Instead, "[t]he court should consider whether a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter. Mere

---

[14] (Citations and punctuation omitted.) *State v. Jung*, 337 Ga. App. 799, 801-802 (788 SE2d 884) (2016), quoting *Williams*, 296 Ga. at 822-823.

[15] (Citations and punctuation omitted.) *State v. Bowman*, 337 Ga. App. 313, 317 (787 SE2d 284) (2016), quoting *Schneckloth v. Bustamonte*, 412 U. S. 218, 227 (II) (B) (93 SCt 2014, 36 LE2d 854) (1973); *State v. Austin*, 310 Ga. App. 814, 817 (1) (714 SE2d 671) (2011).

acquiescence to the authority asserted by a police officer cannot substitute for free consent."[16]

Here, the evidence, including the videotape of the stop, "does not show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain [Young's] consent" to the breath test, and the officers and Young "conducted themselves calmly."[17] The trial court did not find that Young's intoxication, "youth, lack of education, or low intelligence somehow negated the voluntariness of her consent."[18] Instead, the court concluded that Young's consent was involuntary because the police failed to advise her of her *Miranda* rights or to inform her that the test was not mandatory and because the language of the implied consent warning suggests otherwise. But as we have previously concluded, the implied consent notice read to Young "accurately recites Georgia law as contained within OCGA § 40-5-67.1 (b) (2) and informs the suspect of her choice of either agreeing or refusing to submit to chemical testing, and the possible consequences for

---

[16] (Punctuation and citations omitted.) *Kendrick*, 335 Ga. App. at 769.

[17] Id.

[18] Id.

11

each choice."[19] And "[t]here is no unlawful coercion where[, as here,] the officer merely informs the arrestee of the permissible range of sanctions that the [S]tate may ultimately be authorized to impose."[20] Further, "[t]he Supreme Court of the United States and other courts have rejected invitations to create a duty to inform suspects of their constitutional right against unreasonable searches and seizures, and we will not depart from their well-worn path."[21]

The trial court also based its finding that Young did not voluntarily consent to the test on the fact that she was in handcuffs when her consent was requested. But it is well-settled that "the fact that [Young] was in handcuffs [did not] negate her ability to give consent."[22]

---

[19] Id. at 771. See also *Depol*, 336 Ga. App. at 200, n. 7 (rejecting "[the defendant's] argument that we should conclude that he merely acquiesced to a show of authority based upon the language of the implied consent notice").

[20] (Punctuation omitted.) *Gutierrez v. State*, 228 Ga. App. 458, 460 (2) (491 SE2d 898) (1997).

[21] *Kendrick*, 335 Ga. App. at 770, citing *Schneckloth*, 412 U. S. at 231 (II) (B); *Gutierrez*, 228 Ga. App. at 460 (2). See also *Jacobs v. State*, ___ Ga. App. ___, ___ (2) (Case No. A16A1115, decided Sept. 29, 2016) ("There is . . . no duty to inform suspects of their constitutional right against unreasonable searches.").

[22] *Kendrick*, 335 Ga. App. at 770, citing *Silverio v. State*, 306 Ga. App. 438, 446 (3) (702 SE2d 717) (2010) ("voluntary consent may be given while a suspect is handcuffed"). See also *Jacobs*, ___ Ga. App. at ___ (2); *Maloy v. State*, 293 Ga. App.

Based upon our de novo review of the undisputed evidence before the trial court, including the video recording, and our application of the law to these undisputed facts, we conclude that the State met its burden of proving that Young voluntarily consented to the breath test under the totality of the circumstances.[23] Young immediately verbally agreed to submit to the requested breath test, and there is no evidence of "any coercive circumstances that would undercut the voluntariness of [her] consent."[24] Because "there is no evidence that [Young's] consent was anything but free and voluntary," the trial court erred by granting her motion in limine to exclude the results of the State-administered breath test.[25]

*Judgment reversed. Andrews, P. J. and Ray, J., concur.*

---

648, 651 (2) (667 SE2d 688) (2008).

[23] See *State v. Domenge-Delhoyo*, __ Ga. App. ___, ___ (1) (Case No. A16A0362, decided July 15, 2016) (physical precedent only); *State v. Reid*, 337 Ga. App. 77, 78 (786 SE2d 694) (2016); *Depol*, 336 Ga. App. at 200.

[24] *Reid*, 337 Ga. App. at 78.

[25] Id. See also *Domenge-Delhoyo*, ___ Ga. App. at ___ (1); *Depol*, 336 Ga. App. at 200. In *Birchfield v. North Dakota*, 579 U. S. ___ , ___ (V) (C) (3) (136 SCt 2160, 195 LE2d 560) (2016), the United States Supreme Court recently held that the Fourth Amendment allows breath tests under the search-incident-to-arrest exception to the warrant requirement. Because Young gave actual consent to the breath test, we need not decide whether the test was also permitted as a search incident to her arrest.